**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAUL ROJAS and JOSE M. LOPEZ, individually and on behalf of all others similarly situated | : : : : : | **OPINION** |
| Plaintiffs, | : : | Civ. No. 04-3195 (WHW) |
| v. | : : : | |
| CITY of NEW BRUNSWICK, MAYOR JAMES M. CAHILL, POLICE DIRECTOR JOSEPH CATANESE, DETECTIVE ROYCE CRADIC, POLICE OFFICER GEORGE SANTIAGO, MUNICIPAL COURT JUDGE GERALD GORDON and JOHN DOES 1-XX, | : : : : : : : : : | |
| Defendants. | : : | |

**<u>Walls, Senior District Judge</u>**

Presently before the Court are the motions by Defendants City of New Brunswick ("New Brunswick"), James M. Cahill ("Mayor Cahill"), Joseph Catanese ("Director Catanese"), Gerald Gordon ("Judge Gordon"), Royce Cradic ("Detective Cradic"), and George Santiago ("Officer Santiago") (collectively, the "Defendants") for summary judgment on all counts of the Amended Complaint by Plaintiffs Raul Rojas and Jose Lopez ("Plaintiffs") and Plaintiffs' cross-motion for summary judgment. Having considered the parties' written submissions and oral arguments, the Court grants in part and denies in part Defendants' motions for summary judgment and denies Plaintiffs' cross-motion for summary judgment.

**NOT FOR PUBLICATION**

## BACKGROUND

### A.     The Parties

Plaintiffs Rojas and Lopez reside in the City of New Brunswick, County of Middlesex,
New Jersey.  New Brunswick is a public entity organized under N.J.S.A. 40A:61-1, located in the
County of Middlesex, New Jersey, and has a population of approximately 50,000 people.  (2000
Census Data, U.S. Census Bureau (2000)).  Nearly forty percent of New Brunswick's population
identify themselves as of Hispanic or Latino origin.  Id.  Mayor Cahill is the Mayor of the City of
New Brunswick.  He was elected as Mayor in 1991.  Judge Gordon was appointed and served as
a municipal court judge for the City of New Brunswick from February 1994 to January 2006.  At
all times relevant to this matter, Judge Gordon served as a municipal judge for New Brunswick.

Director Catanese is the Director of the New Brunswick Police Department, a position he
has held since December 1, 2000.  Director Catanese has the authority to "administer and enforce
the Rules and Regulation of the Police Department."  N.J.S.A. 40A:14-118(a).  Director
Catanese oversees the day to day operations of the police department, implementing general
orders, special orders, policies and procedures.  Detective Cradic is a detective assigned to the
Major Crimes Unit of the police department.  His duties and responsibilities include the
investigation of major crimes, such as homicides, unattended deaths, robberies, arson and sexual
assaults.  Officer Santiago is a patrol officer for the police department.

### B.     Circumstances of the Arrest and Bail of Plaintiff Rojas

The alleged circumstances of Rojas's arrest and setting of bail are as follows.  After a
June 2002 homicide of a gang member from the 18th Street gang, the police department added

**NOT FOR PUBLICATION**

more patrols on the street.  Detective Cradic and Officer Patrick Frigiola patrolled the area

around French Street on information that members of the 18th Street gang were coming from

out-of-town into New Brunswick to retaliate against members of La Mugre, a rival gang, for the

murder of a member of the 18th Street gang.

At approximately 11:00 pm on July 6, 2002, Rojas was standing on French Street in the

City of New Brunswick, talking with a companion.  While on patrol, Detective Cradic observed

Rojas with a "18" tattoo on his upper back standing on the corner of French Street and Townsend

Street.  According to the Detective, because French Street is known to the New Brunswick police

as La Mugre territory, he wanted to conduct a field interview of Rojas to learn if he had any

information about the homicide and/or the anticipated retaliation.

The testimonies of Rojas and Detective Cradic differ at this point.  According to Rojas,

Detective Cradic approached him and his companion because the police charged them with

loitering.  The officers drove their car up to Rojas and his companion and turned on their car

lights at them.  The two officers got out of their car and told both Rojas and his companion to put

their hands against the wall and not move.  Detective Cradic asked for identification.  When

Rojas said he had none, Detective Cradic reached into Rojas's pocket and pulled out his wallet,

which contained a social security card.  Detective Cradic asked Rojas a series of questions about

whether the social security card was valid and whether he was a member of the 18th Street gang

**NOT FOR PUBLICATION**

because of the "18" tattoo on his upper back.  Rojas admitted that the social security card was fake but denied that he was a member of the gang.[1]  Detective Cradic then arrested Rojas.

However, according to Detective Cradic, he asked Rojas for identification and Rojas produced a social security card.  After Detective Cradic questioned the validity of the social security card, Rojas admitted that he had purchased the card on the street and that it was fake.  Detective Cradic placed Rojas under arrest for possessing and presenting false identification.

Municipal Court Judge Ronald Wright ("Judge Wright") initially set bail for Rojas in the amount of $25,000 after Detective Cradic had requested a "high bail until Monday" for Rojas.  Judge Wright later changed the bail setting to "no bail."   On July 12, 2002, Rojas appeared before Judge Ralph Stanzione ("Judge Stanzione"), Chief Judge of the New Brunswick Municipal Courts, as per Judge Roger W. Daley, for his first bail review.  Judge Stanzione set bail for $500,000.00 with no ten (10) percent option.

Rojas appeared before Judge Gordon on October 23, 2002 with his criminal defense attorney, Gail Belfert, and requested an adjournment.  Judge Gordon asked Rojas to provide valid identification.  After Ms. Belfert objected under the Fifth Amendment, Judge Gordon ordered Rojas detained for the Immigration and Naturalization Service ("INS").  Ida Cambria appeared subsequently before Judge Gordon, who denied her request to release Rojas.  Ms. Cambria later made an emergent application to Judge Travis Francis, J.S.C., appealing Judge Gordon's

---

[1]  During his deposition, Rojas had admitted that he was a gang member from December 1999 to April 2000 but had left the gang two years before this incident.

-4-

**NOT FOR PUBLICATION**

decision to detain Rojas for the INS.  Judge Francis overruled Judge Gordon's decision to retain

Rojas, reduced the bail setting to $2,500 with the 10% option and released Rojas on bail.

> **C.    Circumstances of the Arrest and Bail of Defendant Lopez**

The alleged circumstances of Lopez's arrest and setting of bail are these.  Lopez and the

arresting officer, Officer Santiago, differ on the accounts.  According to Lopez, on September 25,

2002, he was going home on his bicycle when Officer Santiago's police car cut him off.  Officer

Santiago got out of the car, told Lopez to put his hands up, searched Lopez and removed his

wallet.  Officer Santiago searched Lopez without a warrant.

However, according to Officer Santiago, they were responding to a 911 call about a

suspicious male lying on the lawn of a residence with a bicycle at his feet.  Officer Santiago went

over to Lopez and asked in Spanish whether he needed medical assistance and for his name,

address and other identification.  Officer Santiago also noticed that the bicycle still retained its

price tag, stickers, and instruction and assembly manuals.[2]   Instead of responding with answers,

Lopez cursed at Officer Santiago.  Then Officer Santiago asked if he owned the bicycle.  Because

Lopez failed to cooperate with Officer Santiago and failed to produce a receipt for the bicycle,

Officer Santiago arrested Lopez for obstruction of justice and receiving stolen property.  While

driving to the police station, Lopez kicked Officer Santiago on the arm and shoulder.  At the

police station, Lopez was also charged with aggravated assault, but was not charged with

obstruction.

---

[2] Lopez admitted that the bicycle still had its price tag, stickers, and instruction and assembly manuals attached.  (Ex. 13 to Defs. Joint Statement of Facts ("Defs. JSOF"), Deposition of Jose Lopez, at T173:8-24 and T179:5-13) ("Lopez's Dep.").)

NOT FOR PUBLICATION

Judge Gordon received the proposed Warrant-Complaint which described the two count

charge of receiving stolen property and aggravated assault.  Judge Gordon set bail at $25,000

with no ten (10) percent option.  On September 27, 2002, at Lopez's first bail review, Judge

Stanzione reduced the amount of bail to $20,000, with no ten (10) percent option.

### D.      Procedural History and Relevant Statutes

Plaintiffs Rojas and Lopez filed a class action suit on behalf of themselves and similarly

situated Latinos in New Brunswick, pursuant to 28 U.S.C. § 1983 and 28 U.S.C. § 1988, against

the New Brunswick, Mayor Cahill, Director Catanese, Detective Cradic, Officer Santiago, Judge

Gordon, and John Does I-XX (collectively the "Defendants") on July 6, 2004.  On August 2,

2004, Plaintiffs amended the Complaint.  (Amended Complaint, Rojas v. New Brunswick, No.

04-3195 (D.N.J. Aug. 2, 2004) ("Am. Compl.").)  Plaintiffs state that Defendants systematically

stop, search, and arrest Latinos for minor offenses and then hold them with excessive bail or no

bail.  Plaintiffs allege violations of their First, Fourth, Fifth, Sixth, and Eighth Amendment rights

as well as their due process and equal protection rights under the United States Constitution.

Plaintiffs also asserts violations of their equal protection rights under the New Jersey

Constitution and various rights under New Jersey law.

Plaintiffs' class action is premised on allegations that Defendants overcharged and set

excessive bails on individuals for minor offenses.  (Pls. Brief in Support of Motion for Class

Certification,  Rojas v. New Brunswick, No. 04-3195 (D.N.J. May 31, 2007) ("Pls. Class Cert.

Br.").)  That these acts violate the Constitution of the United States and the Constitution of New

Jersey.  The Eighth Amendment of the U.S. Constitution provides that "[e]xcessive bail shall not

-6-

**NOT FOR PUBLICATION**

be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Paragraph 11 of Article I of the Constitution of New Jersey provides that "[a]ll persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or presumption great." N.J. Const. art. I, para. 11. Paragraph 12 of Article I of the Constitution of New Jersey provides that "[e]xcessive bail shall not be required, excessive fines shall not be imposed, and cruel and unusual punishments shall not be inflicted." N.J. Const. art. I, para. 12.

Plaintiffs refer to the New Jersey Code of Criminal Justice to support their claims for excessive bail. N.J.S.A. § 2C:6-1 (Persons accused of minor offenses) provides that:

> No person charged with a crime of the fourth degree, a disorderly persons offense or a petty disorderly persons offense shall be required to deposit bail in an amount exceeding $2,500.00, unless the court finds that the person presents a serious threat to the physical safety of potential evidence or of persons involved in circumstances surrounding the alleged offense or unless the court finds bail of that amount will not reasonably assure the appearance of the defendant as required. The court may for good cause shown impose a higher bail; the court shall specifically place on the record its reasons for imposing bail in an amount exceeding $2,500.00.

N.J.S.A. § 2C:6-1. Because Plaintiffs were charged for minor offenses but received bail amounts exceeding the statutory limit of $2,500, Plaintiffs allege that Defendants set bail amounts in violation of the Eighth amendment of the United States Constitution and Article I of the Constitution of New Jersey.

On May 29, 2007, Defendants Officer Santiago and Detective Cradic ("Defendant Officers") filed separate motions for summary judgment on all counts. On May 30, 2007, Defendants Judge Gordon, New Brunswick, Mayor Cahill and Director Catanese filed separate motions for summary judgment on all counts. On July 31, 2007, Plaintiffs Rojas and Lopez filed

NOT FOR PUBLICATION

their opposition to Defendants' motion for summary judgment and their cross-motion for

summary judgment.  On September 28, 2007, Defendants filed their replies.

## STANDARD OF REVIEW

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and the moving party is entitled to a judgment as a matter of law.'"  Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion

for summary judgment, the court must construe the facts and inferences in a light most favorable

to the non-moving party.  Pollock v Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir.

1986).  The role of the court is not "to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249 (1986).  A genuine issue of material fact exists only if the evidence presented

would enable a reasonable jury to return a verdict for the non-movant.  See id. at 248.  Summary

judgment must be granted if no reasonable trier of fact could find for the non-moving party.  See

id. at 249.

The non-moving party may not defeat summary judgment by simply resting on the

argument that the record contains facts sufficient to support his claims.  See Big Apple BMW,

Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S.

912 (1995); O'Donnell v. United States, 891 F.2d 1079, 1082 (3d Cir. 1989).  Rather, the non-

moving party must go beyond the pleadings and, by affidavits or other evidence, designate

**NOT FOR PUBLICATION**

specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324; Fed. R.

Civ. P. 56(e).  Such affidavits must be based "on personal knowledge," establish "such facts

which would be admissible," and "show affirmatively that the affiant is competent to testify in all

matters stated therein."  Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir. 1985); see also 6 J.

Moore, W. Taggert & J. Wicker Moore's Federal Practice § 56.22[1] (2d ed. 1985).

"[C]onclusory statements, general denials, and factual allegations not based on personal

knowledge [are] insufficient to avoid summary judgment."  Olympic Junior, Inc. v. David

Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972); see also First Nat'l Bank of Ariz. v. Cities

Service Co., 391 U.S. 253, 288-90 (1968); Gostin v. Nelson, 363 F.2d 371 (3d Cir. 1966).  To

prevail on a motion for summary judgment, the non-moving party must "make a showing

sufficient to establish the existence of [every] element essential to that party's case, and on which

that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.


**DISCUSSION**

The Complaint sets forth thirteen causes of action against six defendants, which

Defendants are seeking to dismiss by summary judgment:[3]

| | |
|---|---|
| Count one: | First amendment violation via 42 U.S.C. § 1983; |
| Count two: | Fourth amendment violation via 42 U.S.C. § 1983; |
| Count three: | Fifth amendment violation via 42 U.S.C. § 1983; |
| Count four: | Sixth amendment violation via 42 U.S.C. § 1983; |
| Count five: | Eighth amendment violation via 42 U.S.C. § 1983; |

---

[3]  With the exception of counts nine, eleven and twelve, Plaintiffs aver generally against "defendants."  During the April 30, 2008 hearing, it become clear that not all counts are being asserted against all defendants despite the lack of specificity in the Amended Complaint.

NOT FOR PUBLICATION

| | |
|---|---|
| Count six: | Equal protection clause under U.S. Constitution; |
| Count seven: | Equal protection clause under N.J. Constitution; |
| Count eight: | Federal preemption of regulation of immigration; |
| Count nine: | Municipal and Municipal official liability via 42 U.S.C. §§ 1983 and 1986 and the New Jersey State Constitution against Defendants New Brunswick, Mayor Cahill, and Director Catanese.; |
| Count ten: | State law claim for slander and libel; |
| Count eleven: | State law claim for abuse of process and malicious prosecution against Defendants Detective Cradic, Officer Santiago and Judge Gordon; |
| Count twelve: | State law claim for wrongful arrest and false imprisonment against Defendants Detective Cradic, Officer Santiago and Judge Gordon; and |
| Count thirteen: | New Jersey law against discrimination. |

(See Am. Compl.)  "This is a class action suit brought pursuant to 42 U.S.C. § 1983 and 42

U.S.C. § 1988."  (Id. at ¶ 2.)

Plaintiffs have withdrawn their Sixth Amendment claim against Judge Gordon in count

four of the Amended Complaint.  (Pls.' Opp. Br. Judge Gordon's Motion for Summary

Judgment, at 27, Rojas v. New Brunswick, No. 04-3195 (D.N.J. July 31, 2007) ("Pls. Opp.

Gordon Br.").)  Plaintiffs have withdrawn their section 1986 claims against all defendants in

count nine of the Amended Complaint.  (Pls.' Opp. Br. New Brunswick's Motion for Summary

Judgment, at 43, Rojas v. New Brunswick, No. 04-3195 (D.N.J. July 31, 2007) ("Pls. Opp. New

Brunswick Br.").)  Plaintiffs have withdrawn their state law claims for slander and libel in count

ten of the Amended Complaint against Judge Gordon.  (Pls. Opp. Gordon Br., at 28.)

Accordingly, these claims are dismissed as to the respective defendants.

**I.      Section 1983 claims**

Plaintiffs assert constitutional claims for First, Fourth, Fifth, Sixth and Eighth

Amendments violations under 42 U.S.C. § 1983.  In its relevant part, 42 U.S.C. § 1983 provides

that:

NOT FOR PUBLICATION

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C.A. § 1983.  Section 1983 was intended to provide a remedy against actions by the State which deprived people of rights protected by the Constitution and the laws of the United States. Popow v. City of Margate, 476 F. Supp. 1237, 1243 (D.N.J. 1979).  Section 1983 is not, in and of itself, a source of substantive rights.  Rather, it is the method for vindicating violated federal rights.  Baker v. McCullan, 443 U.S. 137, 143 n.3 (1979).  In order to state a cause of action under section 1983, a plaintiff must allege two elements: (1) a violation of a right secured by the Constitution or federal law; and (2) that the violation of that right was committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

>           A.           First Amendment

Plaintiffs claim that Defendants violated Rojas' First Amendment right of free speech when Detective Cradic arrested Rojas for displaying his tattoo and Rojas' First Amendment right of association when Detective Cradic arrested Rojas for standing on the street with an acquaintance.  Plaintiffs claim that Defendants violated Lopez's First Amendment right of association when Officer Santiago arrested Lopez for riding a bicycle in a neighborhood where he did not belong.

Defendants argue that they did not arrest Rojas because he was displaying his tattoo. Also, they did not arrest Rojas or Lopez for being present in a certain neighborhood.  Rojas was

-11-

**NOT FOR PUBLICATION**

arrested for presenting a false social security card, while Lopez was arrested for receiving a stolen bicycle.

Although there may be a genuine issue of material fact as to whether Defendants Detective Cradic and Officer Santiago had probable cause to arrest Rojas and Lopez,[4] there are no genuine issues of material fact that Plaintiffs were not exercising their First Amendment rights. Besides conclusory allegations, Plaintiffs provided no evidence for a reasonable juror to conclude that they were exercising their First Amendment right to free speech and right of association and that Defendants arrested them in retaliation for the exercise of those rights. While it is "possible to find some kernel of expression in almost every activity a person undertakes . . . meeting one's friends at a shopping mall," the Supreme Court explained that "such a kernel is not sufficient to bring the activity within the protection of the First Amendment." Dallas v. Stanglin, 490 U.S. 19, 25 (1989). The Supreme Court rejected the theory that the "right" to associate solely for recreational pursuits is a constitutionally-protected privilege. Id. Plaintiffs have not established that their first element for a section 1983 claim that their First Amendment rights were violated. West, 487 U.S. at 48. The Court will grant Defendants' motion for summary judgment on Plaintiffs' claims of First Amendment violations.

### B. Fourth Amendment

Plaintiffs claim that Defendant Officers arrested Plaintiffs without probable cause in violation of the Fourth Amendment. A warrantless public arrest does not violate the Fourth

---

[4] Whether Defendants violated Plaintiffs' Fourth Amendment rights to be free from unreasonable search and seizure will be examined in subsection I.B (below).

NOT FOR PUBLICATION

Amendment "where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). To prevail in a section 1983 action for false arrest, a plaintiff must establish that he was arrested without probable cause. Santiago v. City of Vineland, 107 F. Supp. 2d 512, 561 (D.N.J. 2000). Probable cause may only exist when there is "proof of facts and circumstance that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993).

In practice, when an officer does not have a warrant for an arrest, before an arrest is made, the officer usually conducts an investigatory stop. The Fourth Amendment permits the police to conduct "a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). To determine whether the circumstances support an investigatory stop, courts take into account the "totality of the circumstances-the whole picture." United States v. Cortez, 449 U.S. 411, 417-18 (1981). Under this approach, "even factors independently 'susceptible to innocent explanation' can collectively amount to reasonable suspicion." United States v. Brown, 448 F.3d 239, 252 (3d Cir. 2006). Police officers may rely on "their own experience and specialized training to make inferences from and deductions about the cumulative information available to them, that 'might well elude an untrained person.'" United States v. Arizu, 534 U.S. 266, 273 (2000).

### 1. Detective Cradic

Detective Cradic asserts three defenses: (1) Rojas identified an officer who reached into his pocket whose description does not fit Detective Cradic's profile; (2) Detective Cradic did not

**NOT FOR PUBLICATION**

violate Rojas' Fourth Amendment right because he arrested Rojas with probable cause; and (3) Detective Cradic is entitled to qualified immunity.

In Rojas' deposition, Rojas testified that a "coffee-colored" officer who "looked Hispanic" was the officer who "[digged] his hands in my pockets." (Ex. 12 to Defs. Joint Statement of Facts ("Defs. JSOF"), Deposition of Rojas, T91:10-23, T92:8-14, T106:17-107:4 ("Rojas' Dep.").) Detective Cradic states that he is white and "American." (Defs. JSOF, at 22.) Detective Cradic argues that if the Court were to take facts alleged by Rojas in a light favorable to Rojas, even then, Cradic was not the person who violated his Fourth Amendment right; the alleged violator was a coffee-colored Hispanic officer. At the April 30, 2008 hearing, Rojas' counsel argued that Rojas testified that there were two officers at the scene, the officer spoke to Rojas with a book-learned Spanish and it is quite possible that during the summer of the arrest, Detective Cradic may have had a tan or looked coffee-colored at night. The Court finds that there is a genuine issue of material fact as to the identity of the officer and, for the purposes of a Fourth Amendment analysis at the summary judgment stage, assumes that it was Detective Cradic.

Detective Cradic's second and third defenses will be analyzed jointly because the qualified immunity defense includes a determination of whether there was a constitutional violation. In Scott v. Harris, the Supreme Court recently reiterated the qualified immunity analysis:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." If, and only if, the court finds a violation of a

-14-

NOT FOR PUBLICATION

> constitutional right, "the next, sequential step is to ask whether the right was clearly
> established . . . in light of the specific context of the case."

--- U.S. ---, 127 S. Ct. 1769, 1774 (2007) (citations omitted).  If a public official could have

reasonably believed that his or her acts were lawful under the then-established law and current

information, that official would be entitled to qualified immunity from liability.  Ryan v.

Burlington County, 889 F.2d 1286, 1292 (3d Cir. 1989).  When considering whether an alleged

right is "clearly established," the Court must bear in mind that "defendants are neither

constitutional lawyers nor federal judges."  Rappa v. Hollins, 991 F. Supp. 367, 382 (D. Del.

1997).  Government employees must obey the law as it exists at the time at which they act, "but

need not predict its evolution, [and] need not know that in the fight between broad and narrow

readings of a precedent, the broad reading will become ascendant."  Greenberg v. Kmetko, 922

F.2d 382, 385 (7th Cir. 1991).

Because Detective Cradic conducted an investigative stop before the arrest, the Court will

examine whether the investigative stop violated Rojas' Fourth Amendment right.  The Court

finds that Detective Cradic had reasonable suspicion to conduct an investigative stop.

"Reasonable suspicion" is measured before a search, and information obtained after the search

cannot retroactively justify a Terry stop.  Florida v. J.L., 529 U.S. 266, 271 (2000) (explaining

Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).  Before stopping Rojas, Detective Cradic had the

following information: he was assigned to an "added patrol" because the police had intelligence

indicating that members of the 18th Street gang may be coming from out-of-town into New

Brunswick to retaliate against La Mugre for the killing of one of its member.  (Ex. 22 to Defs.

JSOF, Deposition of Detective Cradic, at 46: 16-25 ("Cradic's Dep.").)  The New Brunswick

NOT FOR PUBLICATION

Police identifies French Street as having a high concentration of gang activity.  (Cradic's Dep., at 51:14-52:6.)  The Supreme Court has noted "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a <u>Terry</u> analysis."  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000).

Detective Cradic stopped Rojas at around 11:20 pm on June 6, 2002.  (Cradic's Dep., at 61:9 - 63:4.)  "The lateness of the hour of the stop further supports the inference of criminal activity, especially when considered alongside the area's reputation for criminal activity."  <u>United States v. Goodrich</u>, 450 F.3d 552, 561 (3d Cir. 2006).  Even though Rojas' counsel argues that Rojas' tattoo is not visible without lifting his shirt, Rojas admitted in his deposition that he has a tattoo with the number "18" on his upper back which is visible and in "plain sight."  (Rojas' Dep., at T110:6-9.)  Because of Rojas' admission, there is no <u>genuine</u> dispute as to whether Detective Cradic could see Rojas' tattoo in plain sight.

From his training and experience, Detective Cradic suspected that Rojas is associated with the 18th Street gang because an "18" tattoo is common among members of that gang. (Cradic's Dep., at 75:1-6.)  While it is entirely legal for Rojas to have an "18" tattoo and stand in front of a convenience store on French Street, the totality of the circumstances permitted Detective Cradic to conduct a <u>Terry</u> stop.  The "Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed."  <u>Johnson v. Campbell</u>, 332 F.3d 199, 207 (3d Cir. 2003) (discussing <u>Terry</u> and <u>Wardlow</u>).

-16-

NOT FOR PUBLICATION

Although Detective Cradic had a reasonable suspicion to stop Rojas, there is a genuine issue of material fact as to whether Detective Cradic had probable cause to arrest Rojas and had violated Rojas' Fourth Amendment right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001) (holding that the first inquiry into qualified immunity is whether the facts alleged show that officer's conduct violated a constitutional right). The genuine dispute arises from the conflicting accounts of whether Detective Cradic reached into Rojas' pocket for his wallet or whether Rojas volunteered and presented the wallet with identification to Detective Cradic. According to Rojas' version, Detective Cradic and another officer arrived in an unmarked car, turned the lights of their vehicle on Rojas and his companion, got out of their car and told both men to put their hands against the wall and not move. (Rojas' Dep., at T89:24 - 93:2; T101:8 - 102:6.) One of the officers asked Rojas for his name and identification in which Rojas identified himself but responded that he did not carry any form of identification. (Rojas' Dep., at 107:24 - 109:2.) The officer reached into Rojas' pocket, pulled out his wallet, picked out his social security card and presented it to Rojas. (Rojas' Dep., at 100:16-101:4; 109:3-8.) The officer questioned Rojas about the validity of the social security card to which Rojas replied that it was invalid. (Rojas' Dep., at 109:6-20.)

Detective Cradic admitted that when he stopped Rojas, he did not suspect Rojas had or was about to commit a crime. (Cradic's Dep., at 64:5-11.) At that time, Detective Cradic did not have probable cause to search or arrest Rojas. "Probable cause existed if 'at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing'" a

-17-

**NOT FOR PUBLICATION**

crime had been committed.  Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curiam).  Detective

Cradic did not explain why he reached into Rojas' pocket because he maintains that he never

reached into Rojas' pocket.  Detective Cradic testified Rojas volunteered his social security card

in response to Detective Cradic's asking for identification.  (Cradic's Dep., 103:2-13.)

Accordingly, there is a genuine issue of material fact as to whether Detective Cradic reached into

Rojas' pocket without consent and whether this intrusion violated Rojas' Fourth Amendment

right.  See Terry v. Ohio, 392 U.S. 1, 21-22 (1968) (when evaluating the "reasonableness of a

particular search or seizure it is imperative that the facts be judged against an objective standard:

would the facts available to the officer at the moment of the seizure or the search warrant a man

of reasonable caution in the belief that the action taken was appropriate?")

  As to the second prong of the Saucier test, the Supreme Court required district courts to

determine whether the plaintiff's constitutional right was clearly established at the time of

violation.  Saucier, 533 U.S. at 201-02.  "[W]hether a right is clearly established is whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted."  Id. at 202.  The Supreme Court explained that "even if a court were to hold that the

officer violated the Fourth Amendment by conducting an unreasonable, warrantless search,

Anderson still operates to grant officers immunity for reasonable mistakes as to the legality of

their actions."  Id. at 206 (explaining Anderson v. Creighton, 483 U.S. 635 (1987)).

  Assuming that Detective Cradic violated Rojas' Fourth Amendment right by conducting

an illegal search, the Court finds that there is a genuine issue of material fact as to whether "it

would be clear to a reasonable officer" that Cradic's conduct was unlawful.  Even under these

**NOT FOR PUBLICATION**

circumstances of suspected gang activity, a reasonable factfinder could conclude that a reasonable officer would understand that reaching into someone's pocket for identification and taking his wallet without permission are clear violations of that person's constitutional right. Detective Cradic's motion for summary judgment is denied as to Plaintiffs' Fourth Amendment claim.

### 2.  Officer Santiago

As to Lopez, there is a genuine issue of material fact underlying whether Officer Santiago is entitled to qualified immunity.  According to Lopez's version of the facts, which is substantially different from Officer Santiago's version and is not blatantly contradicted by the record, a reasonable juror could conclude that Officer Santiago violated Lopez's constitutional right and that this violation was clearly established at that time.  Scott v. Harris, 127 S. Ct. at 1776 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Lopez testified that he was riding his bicycle home when Officer Santiago drove his car in front of Lopez, got out of the car, demanded that Lopez put his hands up, and searched Lopez's pockets all without a warrant.  (Jose Lopez's Answers to Interrogatories, at 2.)  Officer Santiago asked Lopez if the bicycle was stolen and for a receipt.  (Id.)  Officer Santiago handcuffed Lopez after he responded that the bicycle was his but he did not have a receipt.  (Id.)

According to Officer Santiago, they were responding to a 911 call about a suspicious male lying on the lawn of a residence with a bicycle at his feet.  Officer Santiago went over to

-19-

NOT FOR PUBLICATION

Lopez and asked in Spanish whether he needed medical assistance and for his name, address and other identification.  Emergency Medical Service ("EMS") personnel also arrived at the scene. Officer Santiago also noticed that the bicycle still retained its price tag, stickers, and instruction and assembly manuals.  Instead of responding with answers, Lopez cursed at Officer Santiago. Then Officer Santiago asked if he owned the bicycle.  Because Lopez failed to cooperate with Officer Santiago and failed to produce a receipt for the bicycle, Officer Santiago arrested Lopez for obstruction of justice and receiving stolen property.

Defendants corroborate Officer Santiago's version with the following evidence.  A Med-Central Agency Incident Report shows that EMS personnel was dispatched at about 10:33 pm on September 25, 2002 and arrived at 202 Fulton Street, New Brunswick at about 10:38 pm.  (Ex. 39 to Defs. JSOF, Med-Central Agency Report (Incident No. 2002-038289).)  The EMS reported "Other Illness-Medical-BLS" as the reason for the dispatch and that the dispatch was "cancelled on scene" without any reason.  (Id.)  Defendants refer to Lopez's testimony that Officer Santiago had probable cause that Lopez's bicycle may have been stolen because the price tag, stickers, and instruction and assembly manuals were still attached to the bicycle.  (Lopez's Dep., at T173:8-24 and T179:5-13.)  Defendants also refer to Lopez's testimony that "maybe because they way I was dressed, I was not dressed well, [Officer Santiago] must have thought that I might have stolen the bike" and "must have smelled of alcoholic beverages."  (Lopez's Dep., at 165:22-24 and 178:25-179:4.)

Although Lopez's version may be doubtful, it is not blatantly contradicted by the record. The EMS report provides no details about that night or the medical condition of Lopez.  Lopez

-20-

NOT FOR PUBLICATION

had explained that the bicycle still had price tag, stickers, and instruction and assembly manuals

because he purchased it that day at Wal-Mart.  (Lopez's Dep., at T141:5-12 and T143:17-23.)

Officer Santiago could not have noticed Lopez's attire and smell of alcohol before he cut Lopez

off in his police car and stopped Lopez.

Under Lopez's version, a reasonable juror could conclude that Officer Santiago did not

have reasonable suspicion to stop Lopez and did not have probable cause to arrest him.  A

reasonable juror could also conclude that Officer Santiago's mistake was unreasonable under the

reasonable officer standard.  Under these circumstances, there are genuine issues of material fact

underlying the question of law of whether Officer Santiago is entitled to qualified immunity.

Officer Santiago's motion for summary judgment is denied as to Plaintiffs' Fourth Amendment

claim.

### C.        Fifth Amendment

Plaintiffs present two bases for their Fifth Amendment claims: (1) violation of their "right

against self-incrimination" and (2) "the taking of property without due process of law."[5]  The

manner in which Plaintiffs argue the second part of their Fifth Amendment claim fits squarely

within their Sixth Amendment claim.  Basically, Plaintiffs argue that because they were neither

---

[5]  Plaintiffs interpret the "taking of property" to be the taking of liberty.  In their brief in opposition to Detective Cradic and Officer Santiago's motion for summary judgment, Plaintiffs argue that "the police failed at every step to follow the proper procedures thus denying the plaintiffs their property (liberty) without due process of law."  (Pls.' Opp. Br. Detective Cradic's Motion for Summary Judgment, at 20,  Rojas v. New Brunswick, No. 04-3195 (D.N.J. July 31, 2007) ("Pls. Opp. Cradic Br.") (emphasis added).)  The relevant phrase in the Fifth Amendment is "No person shall. . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. (emphasis added).

NOT FOR PUBLICATION

present,[6] nor had counsel present,[7] during the initial bail hearing, they could not confront the false

accusations,[8] and defend against self-incriminating statements during the initial bail hearing.

And as a result, they had bail set at an excessive amount and spent at least a few weeks in prison,

effectively having their liberty taken away without due process of law.  If Plaintiff cannot

establish a Sixth Amendment claim, they cannot assert their second Fifth Amendment claim,

which is premised on a Sixth Amendment violation.  As discussed in subsection I.D ("Sixth

Amendment"), Plaintiffs cannot establish that their Sixth Amendment rights were violated.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' claim that Defendants

"[took their] property (liberty) without due process of law" is granted.

### 1.   Right Against Self-Incrimination

As to Plaintiffs' first Fifth Amendment claim, Plaintiffs allege that Defendants used

statements by Rojas against him, which were obtained without <u>Miranda</u> warnings, to the effect

that Rojas was in this country illegally.  As to Lopez, Plaintiffs fail to identify which statements

were used against him, especially since Lopez denied stealing the bicycle.[9]  Because Plaintiffs

have presented no evidence for a reasonable juror to conclude that statements by Lopez were

---

[6]  "The plaintiffs were further deprived of participating in the initial proceeding which set their bail."  (Pls. Opp. Cradic Br. at 20.)

[7]  "They were not provided an opportunity to retain or be represented by counsel at the initial bail hearing."  (Pls. Opp. Cradic Br. at 20.)

[8]  "They were not allowed to confront the witnesses against them concerning the setting of bail."  (Pls. Opp. Cradic Br. at 20.)

[9]  On June 10, 2003, all criminal charges against Lopez were dismissed.  ( Ex. 42 to Defs. JSOF, Lopez Complaint Dismissed on June 10, 2003.)

**NOT FOR PUBLICATION**

used against him, Lopez's claim for violation of his Fifth Amendment privilege against self-incrimination is dismissed.

Plaintiffs point out two incidences where Rojas' Fifth Amendment privilege against self-incrimination were allegedly violated: (1) "alleged statements coerced from Raul Rojas were used directly against him in the filing of criminal charges against him and to obtain excessive bail"[10] and (2) Judge Gordon's insistence that Rojas produce some form of identification despite his counsel's assertion of Rojas' Fifth Amendment privilege.[11]

Defendants contend that (1) the proper remedy for a Fifth Amendment violation is the exclusion of coerced statements at trial and (2) because no trial took place, Rojas' Fifth Amendment rights were never violated.  On May 6, 2004, all charges against Rojas were dismissed for lack of prosecution.  (Ex. 37  to Defs. JSOF, Order for Dismissal entered by Woodbridge Municipal Court dated May 6, 2004.)  Defendants refer to Chavez v. Martinez, 538 U.S. 767 (2003).  The Supreme Court in Chavez found that it was not until compelled statements are used in a criminal case that a violation of the self-incrimination clause occurs.  Chavez, 538 U.S. at 767 ("We fail to see how, based on the text of the Fifth Amendment, [plaintiff] can allege a violation of this right, since [he] was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case").

At the April 30, 2008 hearing, Plaintiffs countered that although Rojas' coerced statements were not used against him in a criminal trial, his statements were used against him at

---

[10]  (Pls. Opp. Cradic Br. at 19.)

[11]  (Pls. Opp. Gordon Br. at 20-24.)

NOT FOR PUBLICATION

the initial bail hearing and at the hearing before Judge Gordon.  Plaintiffs contend that these

hearings fit within the definition of "criminal case" under the Fifth Amendment that "[n]o person

... shall be compelled in any <u>criminal case</u> to be a witness against himself." U.S. Const. amend.

V. (emphases added).  As a result of the unconstitutional use of Rojas' statements, Judge Wright

set an excessive bail amount and Judge Gordon detained Rojas for the INS.

      In <u>Chavez</u>, the Supreme Court concluded that a criminal case begins at the very least with

the "initiation of legal proceedings."  538 U.S. at 766.  Rejecting the proposition that a "criminal

case" under the Fifth Amendment included every process before and after an indictment,

Supreme Court explained:

> Although [plaintiff] contends that the meaning of "criminal case" should encompass
> the entire criminal investigatory process, including police interrogations, Brief for
> Respondent 23, we disagree.  In our view, a "criminal case" at the very least requires
> the initiation of legal proceedings.

538 U.S. at 766; <u>see also</u> <u>Renda v. King</u>, 347 F.3d 550, 559 (3d Cir. 2003) ("it is the use of

coerced statements during a criminal trial, and not in obtaining an indictment, that violates the

Constitution.") (citing <u>Chavez v. Martinez</u>, 538 U.S. 767 (2003)).  The Supreme Court did not

precisely define when a criminal case begins but gave guidance.  It explained:

> We need not decide today the precise moment when a "criminal case" commences
> . . . .  Statements compelled by police interrogations of course may not be used
> against a defendant at trial . . . but it is not until their use in a criminal case that a
> violation of the Self-Incrimination Clause occurs . . . .  Here, [plaintiff] was never
> made to be a "witness" against himself in violation of the Fifth Amendment's
> Self-Incrimination Clause because his statements were never admitted as testimony
> against him in a criminal case.  Nor was he ever placed under oath and exposed to
> "'the cruel trilemma of self-accusation, perjury or contempt.'"

<u>Chavez</u>, 538 U.S. at 766-67.

-24-

NOT FOR PUBLICATION

Under that guideline, the Court finds that there was no violation of Rojas' Fifth Amendment right during the initial bail hearing because he was not "placed under oath and exposed to 'cruel trilemma of self-accusation, perjury or contempt.'"  However, Rojas' Fifth Amendment right against self-incrimination did attach at the October 23, 2002 hearing before Judge Gordon because Rojas, placed under oath, was compelled to be a witness against himself.

### 2.   Judicial Immunity

Judge Gordon argues that he is entitled to absolute immunity against Rojas' Fifth Amendment claim.  "It is a well settled principle of law that judges are generally 'immune from a suit for money damages.'" Figueroa v. Blackburn, 208 F.3d 435, 440 (3d Cir. 2000) (quoting Mireles v. Waco, 502 U.S. 9 (1991)).  Absolute immunity applies to suits for damages under 42 U.S.C. § 1983 when they act in a judicial capacity.  Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 768 (3d Cir. 2000).  The doctrine is founded upon the premise that "a judge, in performing his or her judicial duties, should be free to act upon his or her convictions without threat of suit for damages."  Figueroa, 208 F.3d at 440.  "Judicial immunity is not overcome by allegations of bad faith or malice."  Mireles, 502 U.S. at 11.  Municipal court judges, who are judges of courts of limited jurisdiction, are likewise afforded the protection of the doctrine of qualified immunity just as judges of general jurisdiction.  Figueroa, 208 F.3d at 441-43.

The undisputed facts are:  Rojas appeared before Judge Gordon on October 23, 2002 on charges of possessing and presenting false identification.  After Judge Gordon requested valid identification from Rojas so that his identity could be confirmed, Ms. Gail Belfert, Rojas' counsel, objected under the Fifth Amendment right against self-incrimination.  Despite the

NOT FOR PUBLICATION

objections, Judge Gordon ordered Rojas to be detained for the INS for an investigation into a possible criminal violation of the Immigration and Nationality Act ("INA").  Ida Cambria, another attorney for Rojas, appeared subsequently before Judge Gordon and told him that Rojas' wife had shown her his birth certificate and that the INS had been notified of Rojas' immigration status during his incarceration but chose not to detain him.  After Judge Gordon denied Cambria's request, Cambria made an emergent application to Judge Travis Francis, J.S.C., appealing Judge Gordon's decision to detain Rojas for the INS.  Judge Francis accepted Cambria's representations, overruled Judge Gordon's decision, reduced the bail setting to $2,500 with the 10% option and released Rojas on bail.  Rojas was released within a few hours after Judge Gordon had detained him.

Plaintiffs argue that Judge Gordon is not entitled to absolute immunity because his actions were either not taken in his judicial capacity or taken in complete absence of all jurisdiction.  Plaintiffs provide as evidence an opinion by the Supreme Court of New Jersey, Advisory Committee on Judicial Conduct ("Advisory Committee").  Reviewing Judge Gordon's conduct with respect to his detainment of Rojas, the Advisory Committee wrote:

> By basing Rojas' legal rights on his immigration status Respondent [Gordon] gratuitously inquired into matters that were not properly before the court.  In doing so, he violated Canons 2A and 3A(1) of the Code of Judicial Conduct and engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of Rule 2:15-8(a)(6).
>
> By his remarks during his telephone conversation with the emergent-duty Superior Court judge, Respondent made it clear that his motivation in holding Rojas, when there was no legal justification for his doing so, was his own fear of the consequences to him and his reputation if he were to release Rojas and if Rojas were then to engage in terrorist activity.  Such concerns are understandable, especially so soon after the events of September 11, 2001, but they are not excusable when they influence the

NOT FOR PUBLICATION

exercise of the judicial office.  Respondent gave the appearance of reacting to Rojas on the basis of a stereotype.  He appeared to equate illegal immigrants with terrorists, which is a manifestation of impermissible bias.  Respondent thereby violated Canons 1 and 2A of the Code of Judicial Conduct and engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of Rule 2:15-8(a)(6).

I.M.O. Gerald Gordon, Former Judge of the Municipal Court, ACJC 2003-264, 2004-031, 2004-034 & 2004-176, at 10 (2007).  In light of this opinion, Plaintiffs contend that Judge Gordon acted as the Attorney General of United States instead of a municipal court judge.

Judge Gordon counters that his actions were judicial in nature because he had requested that Rojas produce identification in a hearing where Rojas was charged with possessing and presenting false identification.  Furthermore, Rojas did not suffer any tangible damages because his detainment was brief, only a few hours.

The Third Circuit in Figueroa v. Blackburn held that judges of limited jurisdiction, such as New Jersey municipal judges, are entitled to absolute immunity.  208 F.3d 435 (3d Cir. 2000).  In Figueroa, plaintiff Robert David Figueroa was charged with petty disorderly persons offenses for sending a harassing letter and documents to two New Jersey superior court judges and appeared before municipal court Judge Audrey P. Blackburn.  Id. at 438.  Figueroa's appearance was for an arraignment, but he told Judge Blackburn that he was not there to enter a plea but rather challenge the jurisdiction of a municipal court over the offenses.  Id.  Judge Blackburn ordered that Figueroa be arrested and held in contempt of court.  Id.  Judge Blackburn issued a contempt order sentencing him to thirty days in prison.  Id.  Figueroa sued Judge Blackburn seeking damages for the deprivation of his constitutional rights under the First, Fourth, Sixth,

-27-

**NOT FOR PUBLICATION**

Eighth and Fourteenth Amendments to the United States Constitution, and Article I, paragraphs

Sixth, Seventh, Tenth and Twelfth of the New Jersey State Constitution.  Id. at 438-39.

   The Third Circuit held that "as a matter of law judges of courts of limited jurisdiction are

entitled to the protection of the doctrine of judicial immunity."  Figueroa, 208 F.3d at 443.  A

judge's "immunity is overcome in only two sets of circumstances.  First, a judge is not immune

from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity.  Second,

a judge is not immune for actions, though judicial in nature, taken in the complete absence of all

jurisdiction."  Figueroa, 208 F.3d at 443 (quoting  Mireles v. Waco, 502 U.S. 9, 11-12 (1991)

(citations omitted)).  An act in excess, or in absence, of jurisdiction is circumscribed in the

following way:

> [I]f a probate judge, with jurisdiction over only wills and estates, should try a
> criminal case, he would be acting in the clear absence of jurisdiction and would not
> be immune from liability for his action; on the other hand, if a judge of a criminal
> court should convict a defendant of an nonexistent crime, he would merely be acting
> in excess of his jurisdiction and would be immune.

Figueroa, 208 F.3d at 444 (quoting Stump v. Sparkman, 435 U.S. 349, 356-57, n.7).

   This case is analogous to the Third Circuit's example of a criminal court judge exceeding

his jurisdiction by convicting a defendant of a non-existent crime.  Here, Rojas appeared before

Judge Gordon on a charge of possessing a false identification, which is a disorderly persons

offense.  (Pls.' Ex. II, Municipal Court Complaint against Rojas.) Inferring from Rojas'

statements that he was here illegally and that Rojas did not have any valid identification, Judge

Gordon took it upon himself to charge and detain Rojas on a possible violation of the INA.  The

facts taken in the light most favorable to Plaintiffs fully demonstrate that Judge Gordon's actions

**NOT FOR PUBLICATION**

were unfair, biased, ignorant and reproachable.  But there is no evidence that a reasonable juror

could conclude that Judge Gordon acted in complete absence of jurisdiction.

Judge Gordon is entitled to absolute immunity under the privilege of judicial immunity.

Because all claims against Judge Gordon arise from these facts, the Court will grant Defendant

Judge Gordon's motion for summary judgment against all claims against him.  Figueroa v.

Blackburn, 39 F. Supp. 2d 479 (D.N.J. 1999), aff'd, 208 F.3d 435, 440 (3d Cir. 2000) (granting

summary judgment against plaintiff's claims that [a municipal court judge's] acts deprived him

of his rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments of the United

States Constitution and Article 1, paragraphs 6, 7, 10, and 12 of the Constitution of the State of

New Jersey after finding that the judge was entitled to judicial immunity).

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' Fifth

Amendment claims is granted in its entirety.

### D.        Sixth Amendment

Although Plaintiffs have withdrawn their Sixth Amendment claim against Judge Gordon,

Plaintiffs continue to assert that the other defendants violated Plaintiffs' Sixth Amendment

rights.  The thrust of Plaintiffs' Sixth Amendment claim is two-fold: defendants violated (1)

Plaintiffs' right to confront witnesses against them and their right to have counsel present at the

initial bail hearing; and (2) defendants failed to adhere to New Jersey Rules of Court which

required that persons charged with a crime of the fourth degree be released with a summons.

N.J. Court R. 3:3-1(c).

NOT FOR PUBLICATION

Plaintiffs' first argument fits well within a Sixth Amendment claim.  The Sixth Amendment provides in relevant part that "[i]n all criminal proceedings, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . and to have the Assistance of Counsel for his defence [sic]."  U.S. Const. amend. VI.  The Sixth Amendment "affords individuals rights to a speedy trial, to an impartial jury, to know the nature and cause of a criminal accusation, to be confronted with the witnesses against them, and to effective assistance of counsel."  Merkle v. Upper Dublin School Dist., 211 F.3d 782, 792 (3d Cir. 2000).

However, Plaintiffs' second argument does not fit within a Sixth Amendment claim.[12] Plaintiffs contend that New Jersey law requires that most persons charged with a crime of the fourth degree, a disorderly person's offense, should be released with a summons.  Rule 3:4-1(a)(1) provides that:

> A law enforcement officer shall take a person who was arrested without a warrant to a police station where a complaint shall be prepared immediately. If it appears that issuance of a warrant is authorized by Rule 3:3-1(c) or the prosecution of the person would be jeopardized by immediate release, the complaint may be prepared on a Complaint-Warrant (CDR2) form. Otherwise, the complaint shall be prepared on a Complaint-Summons (CDR1) form.

N.J. Court R. 3:4-1(a)(1).  In the event a warrant is to be issued, the bail required should not exceed $2,500.00.  N.J.S.A. § 2C:6-1 (Persons accused of minor offenses).  If the bail is to exceed $2,500.00, there must be specific findings placed in the record for the decision.  N.J.S.A.

---

[12]  The Court is not saying that Plaintiffs' second argument is not a claim.  Plaintiffs' second argument falls within their claims for malicious prosecution–that police officers maliciously prosecuted plaintiffs under a complaint-warrant rather than a complaint-summons so that they could hold plaintiffs on excessive bail or without bail.

**NOT FOR PUBLICATION**

§ 2C:6-1.  If bail is being set, then the person charged has a right to counsel and be present for the hearing.  Here, Plaintiffs contend that all these safeguards were violated.

Plaintiffs' first argument will be analyzed under Sixth Amendment jurisprudence, while Plaintiffs' second argument will be analyzed under their claim for malicious prosecution.

The Supreme Court has held that the Sixth Amendment right attaches only at the critical stage of the criminal proceedings, which has been defined as the initiation of adversary judicial proceedings.  Michigan v. Jackson, 475 U.S. 625, 630 n.3 (1986); see also Moran v. Burbine, 475 U.S. 412, 424-25 (1986).  "Instead of moving the sixth amendment right to counsel forward to the arrest stage, and prohibiting governmental interrogation in the absence of counsel thereafter a matter of law, the Court [in Miranda v. Arizona, 384 U.S. 436 (1966)] affirmatively authorized such interrogation."  U.S. v. Muzychka, 725 F.2d 1061, 1067 (3d Cir. 1984).  The district court in Garrera v. Van Engelen explained that:

> The right to counsel protected by Miranda is fundamentally different from the right protected by the Sixth Amendment.  The Fifth Amendment does not guarantee anyone the right to the assistance of counsel; it guarantees the privilege not to be compelled to be a witness against oneself in criminal proceedings.

Garrera v. Van Engelen, No. 88-1238, 1989 U.S. Dist. LEXIS 11980 at *16 (D.N.J. Oct. 10, 1989).  "Rules designed to safeguard a constitutional right, however, do not extend the scope of the constitutional right itself, just as violations of judicially crafted prophylactic rules do not violate the Constitutional rights of any person."  Chavez v. Martinez, 538 U.S. 760, 772 (2003).

State v. Fann is an informative New Jersey decision on when the Sixth Amendment right to counsel and the Sixth Amendment right for a defendant to be present at a bail hearing should attach in a New Jersey state criminal case.  239 N.J. Super. 507, 520, 571 A.2d 1023, 1030 (Law

NOT FOR PUBLICATION

Div. 1990).  The <u>Fann</u> decision is informative because the case deals with the practicalities of the

criminal court process in New Jersey.  The <u>Fann</u> court explained that the "setting of bail certainly

is a 'critical stage' in the criminal proceedings . . . . However, the stage at which bail setting

requires the presence of counsel, absent a waiver of the right, must be subject to certain practical

considerations if the rights of defendants are to be protected properly."  <u>Fann</u>, 239 N.J. Super. at

520.  The <u>Fann</u> court distinguished the initial bail hearing from the first bail review.  The <u>Fann</u>

court elaborated:

> It is impractical and unfair to defendants to expect or require counsel to be present
> for bail purposes immediately after an arrest. Defendant's interest is in the prompt
> setting of reasonable bail. It is also impractical and contrary to the interest of
> defendants to require their presence when bail is set initially. Bail arrangements are
> made by telephone in many cases. Arresting officers call duty prosecutors who
> consult duty judges. Lawyers sometimes initiate calls. Involving unrepresented
> defendants in these calls would delay the fixing of bail and delay is very undesirable.
> A prompt bail review provides the appropriate avenue for satisfaction of the
> constitutional rights to which defendant is entitled.

<u>Id.</u> at 524.  The <u>Fann</u> court held that "the 'critical stage' in bail-setting proceedings, the time

when representation must be made available, if not knowingly and intelligently waived, is at the

<u>first bail review held after the first appearance</u>."  <u>Id.</u> at 520-21 (emphasis added).

At the April 30, 2008 hearing, Plaintiffs invited the Court to hold that the Sixth

Amendment requires that the accused or his counsel be present at the initial bail hearing.  The

Court declines this invitation because the Supreme Court decisions in <u>Michigan v. Jackson</u> and

<u>Moran v. Burbine</u> do not require this result.  <u>Michigan v. Jackson,</u> 475 U.S. 625 (1986); <u>Moran</u>

<u>v. Burbine,</u> 475 U.S. 412, 428 (1986) ("the defendant has the right to the presence of an attorney

during any interrogation occurring after the first formal charging proceeding, the point at which

-32-

NOT FOR PUBLICATION

the Sixth Amendment right to counsel <u>initially</u> attaches.") (emphasis added).  The <u>Fann</u> court

also does not require the result advocated by Plaintiffs.

   This Court agrees with the <u>Fann</u> court that the Sixth Amendment right attaches during the

first bail review held after the first appearance.  Plaintiffs have made no allegations and provided

no evidence that they were absent at the first bail review held after the first appearance and that

they were not afforded the right to counsel.  In fact, both Plaintiffs appeared before Judge

Stanzione, who is not a named defendant in this matter, for their first bail review.  On July 12,

2002, Rojas appeared before Judge Stanzione for the first bail review.  (Ex. 32 to Defs. JSOF,

Arraignment Form.)  On September 27, 2002, Lopez appeared before Judge Stanzione for the

first bail review.  (Ex. 40 to Defs. JSOF, Arraignment Form.)  Defendants' motion for summary

judgment as to Plaintiffs' Sixth Amendment claim is granted.

**E.**   **Eighth Amendment**

   Plaintiffs claim that Defendants violated Plaintiffs' Eighth Amendment right to be free

from excessive bail.  The Eighth Amendment of the United States Constitution provides that

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

punishments inflicted."  U.S. Const. amend. VIII.  While the Eighth Amendment's prohibition

against excessive bail is applicable to the states through the Fourteenth Amendment, the "States

remain free within constitutional bounds to define the range of offenses for which bail is

discriminatory."  <u>Sistrunk v. Lyons</u>, 646 F.2d 64, 70 (3d Cir. 1981).  The Eighth Amendment's

prohibitions create "the foundation of a bail system which, by conditioning release on the offer of

-33-

**NOT FOR PUBLICATION**

financial security, seeks to reconcile the defendant's interest in, and society's commitment to, pretrial liberty with the need to assure defendant's presence at trial."  Id. at 68.

Plaintiffs claim that municipal court judges of New Brunswick routinely violated the state statute regarding bail.  The state statute regarding bail provides:

> No person charged with a crime of the fourth degree, a disorderly persons offense or a petty disorderly persons offense shall be required to deposit bail in an amount exceeding $2,500.00, unless the court finds that the person presents a serious threat to the physical safety of potential evidence or of persons involved in circumstances surrounding the alleged offense or unless the court finds bail of that amount will not reasonably assure the appearance of the defendant as required.  The court may for good cause shown impose a higher bail; the court shall specifically place on the record its reasons for imposing bail in an amount exceeding $2,500.00.

N.J.S.A. § 2C:6-1.  Both Plaintiffs had bail set at an amount far exceeding $2,500.00.

As to Rojas, on July 6, 2002, Judge Wright, who is not a named defendant in this matter, set bail at the initial bail hearing in the amount of $25,000.00.  The next morning, Judge Wright changed the bail ruling from $25,000.00 to "no bail."  On July 12, 2002, Judge Stanzione set bail in the amount of $500,000.00 with no ten percent option.  (Ex. 32 to Defs. JSOF, Arraignment Form.)  On July 19, 2002, the Superior Court of New Jersey reduced Rojas' bail amount to $2,500 with a ten percent option.  (Pls.' Ex. DD, Order dated July 19, 2002.)

As to Lopez, on September 26, 2002, Judge Gordon directed that the charges against Lopez be placed on a Warrant-Complaint and set bail in the amount of $25,000 with no ten percent option.  (Ex. 33 to Defs. JSOF, Judge Gordon's Answer to Interrogatories.)  On September 27, 2002, Judge Stanzione reduced bail to $20,000 with no ten percent option. (Ex. 40 to Defs. JSOF, Arraignment Form.)

NOT FOR PUBLICATION

Plaintiffs did not name Judge Wright nor Judge Stanzione in this action although their decisions as to the amount of bail set for Plaintiffs exceeded the statutory limit of $2,500. Plaintiffs are not bringing an Eighth Amendment claim against Judge Gordon. During the April 30, 2008 hearing, Plaintiffs' counsel conceded, and the Court agrees under the jurisprudence of judicial immunity, that a judge setting bail during a bail hearing is entitled to judicial immunity even if the bail amount exceeds statutory limits. See Tucker v. Outwater, 118 F.3d 930, 933 (2d Cir. 1997) ("In any event, [the judge's] arraignment of plaintiff and setting of bail were plainly judicial acts.").

Although Plaintiffs refer to testimony that Defendant Officers requested a high bail, the setting of bail was done by Judge Wright, Judge Stanzione or Judge Gordon. Besides this, Plaintiffs have not produced any evidence that any other individual defendants had the authority to set bail or in fact set bail for Plaintiffs. However, Plaintiffs argue that routine violations of New Jersey's bail statute, N.J.S.A. § 2C:6-1, by the municipal judges should be attributable to New Brunswick, Mayor Cahill and Director Catanese (the "Municipal Defendants") despite that the municipal judges are immune from their judicial actions. Accordingly, the Court will analyze Defendants' motion for summary judgment as to Plaintiffs' Eighth Amendment claim under Plaintiffs' claim for municipal and municipal official liability, which is discussed in section II.B (below).

## II.    Municipal and Municipal Official Liability

Plaintiffs have withdrawn count nine of the Amended Complaint under 42 U.S.C. § 1986. Plaintiffs intend to proceed with their claims under count nine pursuant to 42 U.S.C. § 1983.

NOT FOR PUBLICATION

Plaintiffs allege that "Defendants Mayor Cahill, Police Director Catanese, John Doe XI-XX, and/or the City of New Brunswick had knowledge or, had they diligently exercised their duties to instruct, supervise, control and discipline on a continuing basis, should have knowledge that the wrongs conspired to be done, as alleged herein, were about to be committed."  Am. Compl. at ¶ 99.  Plaintiffs also allege that "Defendants aforesaid directly or indirectly, under color of law, approved and ratified the unlawful, deliberate, malicious, reckless and wanton conduct of defendants Cradic, Santiago, Gordon and John Doe I-X as herein described." Id. at ¶ 101.  In other words, Plaintiffs allege that Municipal Defendants are liable for the conduct of Defendant Officers and Judge Gordon under supervisory liability and Monell liability.

### A.        Supervisor Liability

In Plaintiffs' opposition to summary judgment briefs, Plaintiffs argue that Police Director Catanese was in charge of the training of officers as to the proper procedures for arresting criminal suspects to arranging bail.  ("Pls. Opp. New Brunswick Br., at 14-16.)  Mayor Cahill is liable because Police Director Catanese serves at Mayor Cahill's pleasure.  Id. at 36.  Plaintiffs claim that the lack of proper training resulted in repeated violations of arrestees' constitutional rights.  "A supervising authority may be liable under § 1983 for failing to train police officers when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact." Gilles v. Davis, 427 F.3d 197, 207 n.7 (3d Cir. 2005) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

To establish liability on a failure to train claim under section 1983, a plaintiff "must identify a failure to provide specific training that has a causal nexus with [his] injuries and must

NOT FOR PUBLICATION

demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997). Furthermore, Plaintiffs must "present scienter-like evidence of indifference on [the] part of a particular policymaker or policymakers." Simmons v. Philadelphia, 947 F.2d 1042, 1060-61 (3d Cir. 1991).

A review of Plaintiffs' briefs show that Plaintiffs are attempting to demonstrate a casual nexus between a failure to provide specific training for Defendant Officers and violations of Plaintiffs' constitutional rights. The only evidence produced by Plaintiffs regarding the lack of training show that Defendant Officers may not have been properly trained on post-arrest procedures for the arrangement of bail. (See Pls. Opp. New Brunswick Br., at 14-20.) That evidence may support a claim for malicious prosecution but does not support Plaintiffs' section 1983 claims. Furthermore, the only viable section 1983 claim against the Defendant Officers is Plaintiffs' Fourth Amendment claim for unreasonable search and seizure.

As to Plaintiffs' section 1983 claim for a Fourth Amendment violation, Plaintiffs have not made any showing that a reasonable juror could conclude that Defendants' failure to provide specific training was the proximate cause of Officer Santiago's violation of Lopez's Fourth Amendment right to be free from unreasonable search and seizure and arrest without probable cause. Nor have Plaintiffs presented any scienter-like evidence for a reasonable juror to conclude that Mayor Cahill or Police Director Catanese were deliberately indifferent. Mayor Cahill and Police Director Catanese's motion for summary judgment against Plaintiffs' section 1983 claims that Municipal Defendants are liable under supervisor liability is granted.

-37-

NOT FOR PUBLICATION

> B.        **Monell Liability**

Plaintiffs make no factual allegations nor present any evidence that Mayor Cahill, Police

Director Catanese and New Brunswick were directly or personally involved in the arrest and bail-

setting for either Plaintiffs.  Furthermore, Plaintiffs seek an injunction preventing Defendants

from continuing a specific course of conduct which they claim is a policy, practice or custom of

New Brunswick.  As such, the Court finds that Plaintiffs are suing these three defendants in their

official capacity.  "Regardless of the manner by which a plaintiff designates the action, a suit

should be regarded as an official-capacity suit . . . when [the] 'judgment sought would expend

itself on the public treasury or domain, or interfere with the public administration, or if the effect

of the judgment would be to restrain the Government from acting, or to compel it to act.'"  Howe

v. Bank for Intern. Settlements, 194 F. Supp. 2d 6, 19 (D. Mass. 2002) (quoting Dugan v. Rank,

372 U.S. 609, 620 (1963)).  "[A]n official-capacity suit is, in all respects other than name, to be

treated as a suit against the entity."  Brandon v. Holt, 469 U.S. 464, 471-72 (1985).  Accordingly,

the Court will treat Plaintiffs' claims against Mayor Cahill and Police Director Catanese in their

official capacity as claims against them and New Brunswick under Monell v. Dep't of Social

Services, 436 U.S. 658, 690 n.55 (1978) (explaining that suits brought against state officials in

their official capacity "generally represent only another way of pleading an action against an

entity of which an officer is an agent.").

In order to hold a municipality liable, plaintiffs must establish that the action of its

employee, which deprived plaintiffs of their federal rights, was the result of a policy, statement,

ordinance, regulation or decision officially adopted and promulgated by the municipality's

NOT FOR PUBLICATION

officers or pursuant to a governmental custom.  Monell v. Dep't of Social Services, 436 U.S. 658 (1978).  A resolution passed by a city council or the implementation of city ordinances would satisfy the requirement that a policy, practice or custom existed.  Pembaur v. Cincinnati, 475 U.S. 469, 471 (1986).  "A course of conduct is considered to be a 'custom' when though not authorized by, 'such practices of state officials [are] so permanent and well settled as to virtually constitute law.'" Andrews v. Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1986).  A single unlawful act of an employee does not imply a policy, practice or custom sufficient to impose liability under Monell.  Oklahoma v. Tuttle, 471 U.S. 808 (1985); Whitted v. City of Philadelphia, 744 F. Supp. 649 (E.D. Pa. 1990) (failure of police officer to obey regulation on use of baton does not imply a policy or custom).

Plaintiffs cite to the Third Circuit's opinion Anela v. Wildwood for the proposition that a city's routine noncompliance with the controlling state rule governing individuals arrested without a warrant could amount to a "policy" for purposes of Monell liability.  790 F.2d 1063 (3d Cir. 1986).  Plaintiffs argue that Municipal Defendants are liable for two types of routine noncompliance with the controlling New Jersey law: (1) Defendants routinely violate New Jersey Court Rule 3:4-1 when police officers acting in concert with municipal court judges issue a warrant-complaint instead of a summons complaint and (2) Defendants routinely violate N.J.S.A. § 2C:6-1 when municipal judges set bail exceeding $2,500 for minor offenses.

First, Plaintiffs cite two New Jersey Court Rules that Defendants must comply with regarding arrest procedures.  New Jersey Court Rule 3:4-1 provides that:

> A law enforcement officer shall take a person who was arrested without a warrant to a police station where a complaint shall be prepared immediately. If it appears that

**NOT FOR PUBLICATION**

issuance of a warrant is authorized by Rule 3:3-1(c) or the prosecution of the person would be jeopardized by immediate release, the complaint may be prepared on a Complaint-Warrant (CDR2) form. Otherwise, the complaint shall be prepared on a Complaint-Summons (CDR1) form.

New Jersey Court Rule 3:4-1.  New Jersey Court Rule 3:3-1(c) provides that:

A summons rather than an arrest warrant shall be issued unless:

(1)     the defendant is charged with murder, kidnapping, aggravated manslaughter, manslaughter, robbery, aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, second degree aggravated assault, aggravated arson, arson, burglary, violations of Chapter 35 of Title 2C that constitute first or second degree crimes, any crime involving the possession or use of a firearm, or conspiracies or attempts to commit such crimes;

(2)     the defendant has been served with a summons and has failed to appear;

(3)     there is reason to believe that the defendant is dangerous to self, other persons, or property;

(4)     there is an outstanding warrant for the defendant;

(5)     the defendant's identity or address is not known and a warrant is necessary to subject the defendant to the jurisdiction of the court; or

(6)     there is reason to believe that the defendant will not appear in response to a summons.

Rule 3:3-1(c).  Plaintiffs state that none of the Rule 3:3-1(c) factors applied to Rojas or Lopez. As such, they should have been released on a summons.

At the April 30, 2008 hearing, Defendants presented and relied on a recent Supreme Court decision addressing an analogous issue.  In Virginia v. Moore, two state police officers arrested David Lee Moore for driving with a suspended license.  --- U.S. ---, 2008 WL 1805745, at *2 (2008).  The officers searched Moore and found that he was carrying 16 grams of crack cocaine and $516 in cash.  Id.  Moore was subsequently charged with possessing cocaine with the intent to distribute it in violation of Virginia law.  Id.

-40-

NOT FOR PUBLICATION

Under Virginia law, the officers should have issued a summons for driving with a suspended license instead of arresting Moore.  Id.  Because the police officers arrested Moore on a non-arresting offense in violation of Virginia law, the Virginia Supreme Court ordered the drug evidence suppressed.  Id.  It "reasoned that since the arresting officers should have issued Moore a citation under state law, and the Fourth Amendment does not permit search incident to citation, the arrest search violated the Fourth Amendment."  Id.  The United States Supreme Court reversed the Virginia Supreme Court when considering the issue "whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law."  Id.  The Court concluded that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."  Id. at *8.

Similarly, whether Defendants violated New Jersey Court Rule 3:4-1 will not alter the Fourth and the Eighth Amendments' protections.  Furthermore, whether Plaintiffs should have been released on a summons rather than detained on a warrant, the Court finds the Third Circuit opinion in Talbert v. Kelly instructive.  799 F.2d 62 (1986).  The Talbert plaintiffs were arrested for theft of cobblestones from a street, a misdemeanor.  Id. at 63. Newark adopted a policy to "hold an accused until he appeared before a magistrate, rather than to allow bail at the stationhouse."  Id. at 65.  Rule 3:4-1 of the Rules Governing Criminal Practice "would have permitted the supervising police officer at the stationhouse to issue a summons to plaintiffs and then release them or admit them to bail."  Id. at 65.  Because no magistrate judge was available to

-41-

**NOT FOR PUBLICATION**

hear bail on Friday, the day after the arrest, plaintiffs were further detained over the weekend until Monday for a hearing before a magistrate judge.  Id. at 63.  Plaintiffs argued and the district court agreed that the better policy was for the stationhouse to issue a summons and release the plaintiffs.  Id. at 67-68.

The Third Circuit, assuming a constitutional violation of plaintiffs' rights, held that Newark's policy to hold an accused for a magistrate judge was not unconstitutional and did not cause the violation of plaintiffs' rights.  Id. at 63.  The Third Circuit explained that it is not the role of a federal judge to determine which of the two policies is better.  Id. at 68.  The Third Circuit wrote:

> This approach implicitly assumes that the task of the federal courts in determining the constitutionality of state or local procedures is to insist upon the best, or what the court may conceive to be the most efficient, method of coping with a problem. We do not consider that to be the role of the federal courts. States and municipalities may use a variety of procedural devices to protect the constitutional rights of the accused; our function is only to determine whether the one adopted fulfills that purpose.  See, e.g., Bell v. Wolfish, 441 U.S. 520, 539, 99 S. Ct. 1861, 1874, 60 L. Ed.2d 447 (1978). If the answer is affirmative, we should go no further.

Id.

Plaintiffs have not produced sufficient evidence to establish that holding arrestees on a warrant for minor offenses rather than releasing them on a summons was a policy, practice or custom of New Brunswick.  Even if the Court were to find that a policy, practice or custom existed, that policy is similar to the policy in Talbert of holding an arrestee until he can appear before a magistrate judge for a bail hearing.  That act of detaining an arrestee on a warrant for a minor offense is not the proximate cause of the violation of Plaintiffs' Eighth Amendment rights.  Talbert, 799 F.2d at 67 ("We believe that this analysis fails to satisfy the requirement of Monell

**NOT FOR PUBLICATION**

and our cases that a sufficient causal relationship be present between the challenged policy and the violation. That the policy made it possible for the violation to have occurred, a "but for" approach, is not enough.").  It is conceivable that a defendant charged with a fourth degree offense be held on a warrant-complaint instead of being released on a summons-complaint and not have his Eighth Amendment right violated.  In that hypothetical situation, a municipal judge could have set bail at an amount lower than $2,500 in compliance with N.J.S.A. § 2C:6-1.

The central issue is whether the policy, practice or custom followed by Defendants was the proximate cause of a violation of Plaintiffs' constitutional right.  In order to answer this question, the Court must examine that decision-making process for the setting of bail and determine whether that process, if routinely followed and resulting in excessive bail amounts in violation of the Eighth Amendment, constituted a policy, practice or custom.  "Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."  Monell, 436 U.S. at 691 (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 167-168 (1970)).  Plaintiffs cite to New Jersey Code of Criminal Justice and Anela that it does amount to a policy, practice or custom that was the proximate cause of Plaintiffs' loss of their Eighth Amendment rights.  N.J.S.A. § 2C:6-1 provides that if a warrant shall issue, the bail amount shall not exceed $2,500.00 unless there is good cause and the reasons shall be stated on the record.

In Anela, the plaintiffs alleged that the "City should be liable because they were held overnight on a charge of violating an ordinance instead of being released to a summons as provided by New Jersey law."  Anela, 790 F.2d at 1065.  Because none of the conditions of Rule

-43-

NOT FOR PUBLICATION

3:3-1(c) applied, the Third Circuit held that the plaintiffs should have been released on a summons.  Anela, 790 F.2d at 1067.   Instead, the plaintiffs were detained pursuant to a bail schedule prepared by the Judge of the Municipal Court.  Id. at 1065.  The municipal court had issued a "Cash Bail Schedule" that ordered the detainment of persons overnight for minor offenses without issuing a summons.  Id. at 1066.  Wildwood acknowledged that it routinely followed the repugnant bail schedule and ignored Rule 3:4-1 when booking arrestees.  Id. at 1067.  "The issuance of a bail schedule by the municipal court [did] not excuse City officials from complying with the New Jersey Supreme Court's rule."  Id.  By following the bail schedule, the "City established a practice contrary to Rule 3:4-1 and must bear responsibility therefore."  Id.

        Although there seems to be a contradiction between the Third Circuit decisions in Anela and in Talbert, the Talbert court explained away the contradiction:

> Anela v. City of Wildwood, 790 F.2d 1063 (3d Cir.1986), does not dictate a contrary approach to that taken here. Like Newark, the City of Wildwood, New Jersey, had failed to adopt the summons procedure outlined in the state criminal practice rules, but instead followed a bail schedule established by a municipal judge. The court held that this was a policy under Monell which could expose the city to liability under § 1983 for unlawfully detaining the plaintiffs. Because the constitutional violation occurred as a result of the city's policy, a nexus could be implied.
>
> Here, however, the detention over the weekend without a bail hearing was not taken pursuant to the policy but rather in deviation from it. Thus, the nexus present in Anela does not exist here.

Talbert, 799 F.2d at 68 n.3.  Defendants argue similarly–that there is no nexus between any alleged policy, practice or custom and the alleged constitutional violation.

NOT FOR PUBLICATION

Defendants claim that <u>Anela</u> is distinguishable because (1) Rule 3:3-1(c) factors did apply when Judge Wright and Judge Gordon set bail for Rojas and Lopez; and (2) there is no policy promulgated by either the municipal court, the New Brunswick police department or New Brunswick that is contrary to Rule 3:4-1.  As to Rojas, Judge Wright acknowledged that under the bail guidelines and without additional considerations, Rojas' bail should have been set at $2,500.  But upon consideration of Rule 3:3-1(c) factors, Judge Wright set bail at $25,000 and changed it to "no bail" the following morning.  (Defs.' JSOF, at 23-24.)  Judge Wright considered Rojas' fourth degree offense with the following information: presentation of a fraudulent identification, suspected gang membership, non-cooperation with police officers and unemployment.

As to Lopez, Judge Gordon explained his decision to place the charges on a Warrant Complaint and set bail at $25,000.  Lopez was charged with receiving stolen property and assault upon Officer Santiago while being transported to headquarters.  Judge Gordon believed that the charges against Lopez were serious, that Lopez would be a danger to others, that the arrest warrant was necessary to subject Lopez to the jurisdiction of the court, that Lopez could not be satisfactorily identified, and that there was reason to believe that Lopez would not appear in response to a summons.  (Gordon's Brief in Support of Motion for Summary Judgment, at 17-18, <u>Rojas v. New Brunswick</u>, No. 04-3195 (D.N.J. May 30, 2007) ("Gordon's Br.").)  Judge Gordon also considered Rule 3:26-1 factors when setting bail, such as Lopez's mental condition and risk of failure to appear.  <u>Id.</u>

**NOT FOR PUBLICATION**

Defendants contend that Plaintiffs have not produced any evidence that there was a promulgated policy similar to the "Cash Bail Schedule" in Anela. Instead, Plaintiffs simply took a list of arrestees charged with fourth degree crimes who had bail set at an amount exceeding $2,500.00. Any decision to set bail is done on a case-by-case basis. The New Jersey statute on persons accused of minor offenses provides that:

> No person charged with a crime of the fourth degree, a disorderly persons offense or a petty disorderly persons offense shall be required to deposit bail in an amount exceeding $2,500.00, <u>unless the court finds that the person presents a serious threat to the physical safety of potential evidence or of persons involved in circumstances surrounding the alleged offense or unless the court finds bail of that amount will not reasonably assure the appearance of the defendant as required.</u> The court may for good cause shown impose a higher bail; the court shall specifically place on the record its reasons for imposing bail in an amount exceeding $2,500.00.

N.J.S.A. § 2C:6-1 (emphasis added). Both Judge Wright and Judge Gordon have the discretion to impose a higher bail for good cause.

The Court agrees that the facts here are significantly different than those in Anela and warrant a different outcome. In Anela, Wildwood "acknowledge[d] that it routinely followed the repugnant bail schedule and ignored Rule 3:4-1 when booking arrestees." Anela, 790 F.2d at 1067. In Anela, the municipal court's repugnant bail schedule was attributable to Wildwood because of Wildwood's routine compliance with that policy. This was enough to imply a nexus. Here, Plaintiffs have not demonstrated that there is an aberrant policy, practice or custom by municipal court judges routinely followed by the Municipal Defendants. Instead, Judge Wright and Judge Gordon testified that they adhered to New Jersey Court Rules. Plaintiffs have not produced any evidence contradicting their testimony except that their testimony should not be

-46-

NOT FOR PUBLICATION

allowed.[13] Reasonable jurors could disagree as to whether those bail amounts were excessive.[14]

However, Plaintiffs presented no evidence for a reasonable juror to conclude that Judge Wright's

and Judge Gordon's actions were taken pursuant to a policy, practice or custom attributable to

the Municipal Defendants or that policy, practice or custom was the proximate cause of

Plaintiffs' injuries. Accordingly, New Brunswick, Mayor Cahill and Police Director Catanese

motion for summary judgment as to municipal and municipal official liability is granted.

### III.    Equal Protection Under the U.S. Constitution and the N.J. Constitution

Plaintiffs allege that Defendants discriminated against Plaintiffs based on their race and

nationality when they arrested Plaintiffs and set excess bail amounts in violation of both the

Equal Protection clause of United States Constitution and the New Jersey Constitution.

Plaintiffs' arguments for equal protection under the New Jersey Constitution are incorporated

with plaintiffs' argument for equal protection under the United States Constitution. Both

Plaintiffs are Latinos and they were allegedly targeted for such discrimination.

The Court will analyze Plaintiffs' federal and state equal protection claims

simultaneously. The Fourteenth Amendment of the United States Constitution provides in

relevant part that:

---

[13]  On January 2, 2008, this Court denied Plaintiffs' motion to strike Exhibit 32, which is Deposition testimony of E. Ronald Wright, J.M.C., Exhibit 35, which is Defendant Gordon's answers to interrogatories and Exhibits 33 & 36, which are Bail reviews by New Brunswick Municipal Court.

[14]  As stated, the municipal court judges may have exceeded their jurisdiction by setting excessive bail amounts, but they are entitled to judicial immunity because their actions were taken in their judicial capacity and not taken in absence of all jurisdiction.

NOT FOR PUBLICATION

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.  To have an equal protection claim under the Fourteenth Amendment, a plaintiff must be able to prove that the actions of the law enforcement officials "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." Bradley v. United States, 299 F.3d 197, 206 (3d Cir. 2002).  In order to demonstrate a discriminatory effect, a plaintiff must show that he is a member of a protected class and was treated differently than similarly situated individuals in an unprotected class.  Id.  Additionally, a plaintiff must show "purposeful and systemic discrimination by specifying instances in which [he] was singled out for unlawful oppression in contrast to others similarly situated." Pagliuco v. City of Bridgeport, No. 3:01CV836, 2005 U.S. Dist. LEXIS 33738, at *18 (D. Conn. Dec. 13, 2005).  The term "similarly situated" has been interpreted to mean "similarly situated in all material respects." Id.

The standard for an equal protection claim under the U.S. Constitution is analogous to the standard for an equal protection claim under the New Jersey Constitution.  Article I, paragraph 1, of the New Jersey Constitution provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  Although the term "equal protection" does not specifically appear in the New Jersey Constitution, Article I, paragraph 1 has been interpreted to confer an analogous right to that available under the Fourteenth Amendment of the U.S. Constitution. Secure Heritage, Inc. v. City of Cape May, 361 N.J. Super. 281 (App. Div. 2003).

NOT FOR PUBLICATION

As to Rojas, Plaintiffs claim that Defendants discriminated against him based on his race and national origin as a Latino.  As evidence that Defendants discriminated against Rojas, Plaintiffs cited the telephone conversation between Detective Cradic and Judge Gordon.  In that conversation, Detective Cradic requested a high bail so that Rojas could be held for the INS.  Judge Gordon agreed that Rojas should be held for the INS and set bail accordingly.  Specifically, Plaintiffs refer to Judge Gordon's statements on the record at Rojas' hearing.  Judge Gordon said that:

> [T]here are people in this country illegally, considering what's happened in this country especially over the last year and a half and it comes to the Court's attention or the Court has a reason to make an inquiry relative to that, especially someone who we have a level of concern with concerning his I.D. and the nature of the charge, that it makes sense for me to make that inquiry.  I'll stand on top of the constitution and make that inquiry every time considering what has happened in this country, especially what happened starting September 11th.  And I don't care whether the person is from China, from Austria, Russia it doesn't matter to me, I'll make inquiry.

(Pls.' Ex. P, at 21.)  Plaintiffs also quote Detective Cradic as saying "what I'm looking for is, ah, a high bail until Monday because I'm gonna have INS put a detainer on him so we can have him deported as a criminal gang member."  Plaintiffs presented an opinion by the Advisory Committee on Judicial Conduct of the Supreme Court of New Jersey in which the Advisory Committee had found that Judge Gordon acted on an impermissible bias by equating illegal immigrants with terrorists.

However, Plaintiffs' evidence only shows that they singled out Rojas and held him for the INS based on his lack of citizenship.  "The prohibition of discrimination based on 'national origin' does not prohibit discrimination on the ground of citizenship."  Mattus v. Facility Solutions, Inc., No. 05-0863, 2005 WL 3132190, at *8 (D.N.J. Nov. 21, 2005) (explaining and

**NOT FOR PUBLICATION**

quoting Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88-89 (1973) ("Congress did not intend the term 'national origin' to embrace citizenship requirements.")).  Plaintiffs have not provided any evidence that a reasonable juror could conclude that Defendants were motivated by a discriminatory purpose against Rojas based on his race and national origin and not because of his allegedly illegal immigration status.

As to Lopez, Plaintiffs make conclusory allegations as to the motive behind Lopez's arrest.  Plaintiffs point to Lopez's high bail amount, his Latino background, and a set of exhibits allegedly showing arrestees as having bail set at excessive amounts for minor offenses for their proposition that this evidence either supports an equal protection claim or raises a genuine issue of material fact that Defendants violated Plaintiffs' equal protection rights.  Plaintiffs provide no direct nor circumstantial evidence that Defendants were motivated by a discriminatory purpose.

More importantly, after reviewing Plaintiffs' exhibits, the Court takes judicial notice of the contradiction between Plaintiffs' equal protection claims and Plaintiffs' exhibit supporting their motion for class certification.  Fed. R. Evid. 201.  There is an apparent contradiction in the two classes of plaintiffs alleged to have been discriminated in Plaintiffs' Amended Complaint and their motion for class certification.  In the Amended Complaint, the Plaintiffs defined the putative class as:

> [A]ll Latino persons living in or traveling in the City of New Brunswick who have in the past been stopped and required to present identification or other documentation, or who have been arrested or detained by defendants and held without bail or on excessive bail, or who have been or will be deterred from freely traveling in or about the City of New Brunswick.

**NOT FOR PUBLICATION**

Am. Compl. at ¶ 4 (emphasis added).  On May 31, 2007, Plaintiffs filed their motion to certify

class, seeking certification of a Class different from the class defined in their First Amended

Complaint.  Plaintiffs define the new Class as:

> All persons for whom bail was set in the city of New Brunswick between
> May 1, 1999 and today, who were held without bail being set and/or whose
> bail was set in excess of the amount allowed by law.

(Plaintiff's Brief in Support of Motion for Class Certification, at ¶ 33, Rojas v. New Brunswick,

No. 04-3195 (D.N.J.  May 31, 2007) ("Pl.'s Class Cert. Br.") (emphasis added).)

    The summary provided by Plaintiffs in support of the motion for class certification where

criminal suspects charged with a fourth degree crime were held on bail exceeding the $2,500 as

prescribed by N.J.S.A. § 2C:6-1 (Persons accused of minor offenses) lists individuals of different

races and nationalities.  During the April 30, 2008 hearing, Plaintiffs' counsel admits that

individuals from all nationalities, including one person from Italy, have had bail set at excess

amounts.  Plaintiffs' argument is that Latinos suffered this violation with greater frequency.

    It is difficult for the Court to understand how Defendants violated that equal protection

clause if on one hand Defendants held Latinos on excess bail or without bail and on the other

hand held all persons in the city of New Brunswick, without regard to race or nationality, on

excessive bail or without bail.  Based on Plaintiffs' exhibits on the individuals of different race

and nationality held on excessive bail or without bail, any evidence of a discriminatory effect

based on race and national origin is eviscerated.

    In light of this contradiction, Plaintiffs have not provided any evidence that a reasonable

juror could find that Plaintiffs were singled out against "others similarly situated".  In other

**NOT FOR PUBLICATION**

words, Plaintiffs have not provided any evidence of discriminatory effect, except for conclusory allegations that those held with excessive bail or no bail were predominately Latinos. Defendants' motions for summary judgment against Plaintiffs' equal protection claim under the United States Constitution and the New Jersey Constitution are granted.

### IV.    Federal Preemption of the Regulation of Immigration

In count eight of Plaintiffs' Amended Complaint, Plaintiffs allege that "Defendants' actions have been taken for the purpose of discouraging Latino immigrants from being in the City. Because the federal government exercises plenary power over the regulation of immigration and, more specifically, over the power to interrogate and arrest individuals believed to be in the United States in violation of immigration laws, defendants' actions are pre-empted by federal law." Am. Compl. at ¶ 96. The only factual allegations supporting this claim relates to Detective Cradic's request to Judge Wright for high bail so that Rojas would be held for deportation by the INS and Judge Gordon's act of detaining Rojas for the INS. The question then is whether Defendants' actions of detaining Rojas for the INS were preempted by federal immigration law.

As a general matter, state and local law enforcement officers are not precluded from enforcing federal statutes. See e.g., Ker v. California, 374 U.S. 23 (1963). Where state enforcement activities do not impair federal regulatory interests concurrent enforcement activity is authorized. Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 142 (1963).

NOT FOR PUBLICATION

Specifically, the Court will look to the language of section 1324(c) of the INA for

guidance into whether the federal regulatory agencies have exclusive enforcement power.

Section 1324(c) of the INA reads that:

> No officer or person shall have authority to make any arrests for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, and <u>all other officers</u> whose duty it is to enforce criminal laws.

8 U.S.C. § 1324(c) (emphasis added).  Some courts have interpreted "all other officers" as local

law enforcement officers shall have the authority to enforce the criminal provisions of the INA.

<u>Gonzales v. City of Peoria</u>, 722 F.2d 468, 476 (9th Cir. 1983), overruled on other grounds by

<u>Hodgers-Durgin v. De la Vina</u>, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (Local enforcement

officers may enforce the criminal provisions of the INA as long as these officers comply with all

the arrest requirements imposed by the United States Constitution.); <u>see also</u> <u>Farm Labor

Organizing Committee v. Ohio State Highway Patrol</u>, 991 F. Supp. 895, 903 (N.D. Ohio 1997)

(permitting state highway patrol officers to enforce criminal provisions of federal immigration

law).  The Tenth Circuit has maintained that the federal law "evinces a clear invitation from

Congress for state and local agencies to participate in the process of enforcing federal

immigration laws."  <u>United States v. Santana-Garcia</u>, 264 F.3d 1188, 1193 (10th Cir. 2001).  The

Tenth Circuit relied on existing case law, which suggests that state and local officers have

"implicit authority" or "general investigatory authority" to investigate and make arrests for

immigration violations.  <u>United States v. Salinas-Calderon</u>, 728 F.2d 1298 (10th Cir. 1984).

Similarly, as early as 1996, the Department of Justice ("DOJ") has held the position that

state and local officers only had the authority to enforce the criminal provisions of the INA.

NOT FOR PUBLICATION

<u>Bronx Defenderx v. U.S. Dept. of Homeland Security</u>, No. 04 CV 8576, 2005 WL 3462725, at *

3 (S.D.N.Y. Dec. 19, 2005).  In 2002, the DOJ changed their position and "openly stated that

state and local law enforcement could, in fact, lawfully enforce the civil provisions of the

immigration law." <u>Id.</u>  Based on the language of section 1324(c) of the INA, legal authority from

other courts, and the DOJ's position, the Court finds that Defendants' authority to investigate and

arrest Plaintiffs for possible violations of the INA is not preempted by the criminal provisions of

the INA as long as local officers comply with all arrest requirements imposed by the United

States Constitution and the INA.  Plaintiffs' claim for preemption is dismissed as a matter of law.

### V.    Various State Law Claims

#### A.        Slander and Libel

Plaintiffs withdrew their state law claims for slander and libel against Judge Gordon.

(<u>See</u> Pls.' Opp. Gordon Br., at 28.)  Besides a general allegation that Defendants "have

wrongfully libeled and slandered the plaintiff[s] Rojas and Lopez," Plaintiffs have not identified

any statements made by Defendants that are libelous and slanderous and have not produced any

evidence to support their claims.  As such, Defendants' motion for summary judgment as to

Plaintiffs' state law claims for slander and liberal is granted.

#### B.        Abuse of Process and Malicious Prosecution

Under New Jersey law, the elements for "[a]n action for malicious prosecution may be

maintained only where it is shown that the criminal action was brought without probable cause,

that it was actuated by malice, that plaintiff suffered a special grievance, and that the criminal

proceedings terminated favorably to the plaintiff."  <u>Rubin v. Novack</u>, 248 N.J. Super. 80, 82

**NOT FOR PUBLICATION**

(App. Div. 1991).  Plaintiffs allege that Defendants initiated criminal proceedings against them, without probable cause and with malice.  Rojas was maliciously charged with possessing false identification, while Lopez was maliciously charged with receiving stolen property and assault upon a police officer.  These criminal proceedings were dismissed in their favor.  They suffered violations of their constitutional rights, including deprivation of liberty by false imprisonment.

Plaintiffs also bring an abuse of process claim.  Plaintiffs allege that Defendant Officers and Judge Gordon abused the post-arrest process by maliciously overcharging them.  Defendants charged Plaintiffs under a complaint-warrant rather than a complaint-summons so that they could hold Plaintiffs on excessive bail or without bail.

A claim of malicious abuse of process "refers to the abuse of procedural methods used by a court to 'acquire or exercise its jurisdiction over a person or over specific property.'" Ruberton v. Gabage, 280 N.J. Super. 125, 131 (App. Div. 1995).  In order to sustain an action for malicious abuse of process, a plaintiff must prove: "1) that defendants made an improper, illegal and perverted use of the process, i.e., a use neither warranted nor authorized by the process and 2) that in use of such a process there existed an ulterior motive.  Proof of the existence of the ulterior motive may be inferred from the improper act, but if the act be a proper one, the motive is immaterial." Ash v. Cohn, 119 N.J.L. 54, 58 (1937).  Plaintiffs must prove that the defendant officers performed "further acts" after issuance of process that constituted an abuse of the legitimate purpose.  Penwag Prop. Co. v. Landau, 148 N.J. Super. 493, 499 (App. Div. 1977). "In the absence of some coercive or illegitimate use of the judicial process, there can be no claim for it[s] abuse." Id.

-55-

NOT FOR PUBLICATION

Judge Gordon argues that he is entitled to judicial immunity, while Detective Cradic and Officer Santiago argue that they are entitled to qualified immunity under N.J.S.A. 59:3-3 and N.J.S.A. 59:3-8.  As stated, Judge Gordon is entitled to absolute immunity under the privilege of judicial immunity because all alleged actions were taken in his judicial capacity.

As to Defendant Officers, New Jersey provides immunity for public employees acting in good faith and within the scope of his employment.  N.J.S.A. 59:3-3 provides that a "public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  N.J.S.A. 59:3-3.  N.J.S.A. 59:3-8 provides that a "public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment."  N.J.S.A. 59:3-8.  "In cases involving claims for unlawful arrest, false imprisonment and malicious prosecution, the qualified immunity analysis turns on whether the police officers reasonably but mistakenly concluded that probable cause existed to arrest, detain and initiate the criminal prosecution."  Palma v. Atlantic County, 53 F. Supp. 2d 743, 769 (D.N.J. 1999).

The Court had found that there are genuine issues of material fact as to whether Defendant Officers arrested Plaintiffs with probable cause and whether they are entitled to qualified immunity.  Lear v. Township of Piscataway, 236 N.J. Super. 550, 553 (App. Div. 1989) (applying the same standards for an analysis of federal qualified immunity as an analysis of the immunity under N.J.S.A. 59:3-3).  According to Plaintiffs' versions of the facts, Defendant Officers would not have any valid reason to arrest them.  The Court finds that there are genuine

-56-

NOT FOR PUBLICATION

issues of material fact as to whether the arrests and prosecutions of Plaintiffs were actuated with malice.  Detective Cradic's and Officer Santiago's motions for summary judgment are denied.

### C.         Wrongful Arrest and False Imprisonment

Plaintiffs allege the same set of facts to support their wrongful arrest and false imprisonment claims as their abuse of process and malicious prosecution claims.  "False arrest" and "false imprisonment" are different names for the same tort.  Price v. Phillips, 90 N.J. Super. 480, 484 (App. Div. 1966).  "False arrest, [like] false imprisonment, is the constraint of a person without legal justification."  Mesgleski v. Oraboni, 330 N.J. Super. 10, 24 (App. Div. 2000).  A plaintiff must demonstrate the existence of "an arrest or detention of the person against his will" which was "done without proper legal authority or 'legal justification.'"  Id.  "Legal justification or probable cause for detention are the defenses to an action for false arrest or imprisonment."  Hayes v. Mercer County, 217 N.J. Super. 614, 623 (App. Div. 1987).  The determination of probable cause, in the context of a false arrest/imprisonment claim, is based upon "objective reasonableness."  Id. at 622-23.

For the same reasons stated in subsection V.B (Abuse of Process and Malicious Prosecution), Judge Gordon is entitled to judicial immunity.  There are genuine issues of material fact as to whether probable cause existed when Detective Cradic arrested Rojas and when Officer Santiago arrested Lopez and whether these arrests were without legal justification.  Judge Gordon's motion for summary judgment for wrongful arrest and false imprisonment is granted.  Detective Cradic's and Officer Santiago's motions for summary judgment are denied.

NOT FOR PUBLICATION

        **D.**        **New Jersey Law Against Discrimination**

The New Jersey Law Against Discrimination ("NJLAD") forbids discrimination against individuals based upon, inter alia, their "race, creed, color, national origin, ancestry, age, [and] sex." N.J.S.a. 10:5-3. The crucial element is the intent to discriminate. <u>Parker v. Dornbierer</u>, 140 N.J. Super. 185, 189, 356 A.2d 1 (App. Div. 1976).

> The act of discrimination requires intent since it in itself is a mental process under which one willingly chooses one or another of alternatives. Of course, we recognize that discrimination is not usually practiced openly and that intent must be found by examining what was done and what was said in the circumstances of an entire transaction.

<u>Id.</u> at 189. To establish a prima facie public accommodation claim brought under the NJLAD, the "focal issue is whether defendant acted with an actual or apparent design to discourage present or future use of the public accommodation by plaintiff on account of her protected status." <u>Turner v. Wong</u>, 363 N.J. Super. 186, 213 (App. Div. 2003). A municipal police department can be considered a "place of public accommodation" in the context of a NJLAD claim. <u>Ptaszynski v. Uwaneme</u>, 371 N.J. Super. 333 (App. Div. 2004).

The legal standards for a claim under the Equal Protection clause of the United States Constitution and the New Jersey Law Against Discrimination are the same. <u>See</u> <u>Bergen Commercial Bank v. Sisler</u>, 157 N.J. 188, 723 A.2d 944 (1999) (adopting standard set by United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)). Because the factual circumstances alleged in Plaintiffs' equal protection claim are the same as their claim under NJLAD, the Court will grant Defendants' motion for

-58-

**NOT FOR PUBLICATION**

summary judgment on Plaintiffs' NJLAD claims for the same reasons the Court granted

Defendants' motion for summary judgment under the Equal Protection clause.


## CONCLUSION

The Court will grant Defendants' motions for summary judgment on Plaintiffs' claims

that Defendants violated their First, Fifth, Sixth and Eighth Amendment rights and their rights

under the Equal Protection clause of the United States Constitution and New Jersey Constitution.

The Court will grant Defendants' motions for summary judgment against Plaintiffs' claims for

federal preemption of immigration laws, municipal and municipal official liability, slander and

libel and violations of the New Jersey Law Against Discrimination.  The Court will grant the

motions of Defendants New Brunswick, Mayor Cahill, Police Director Catanese, and Judge

Gordon for summary judgment against Plaintiffs' Fourth Amendment claim and state law claims

for abuse of process, malicious prosecution, wrongful arrest and false imprisonment.  The Court

will deny the motions of Defendants Detective Cradic and Officer Santiago for summary

judgment against Plaintiffs' Fourth Amendment claim and state law claims for abuse of process,

malicious prosecution, wrongful arrest and false imprisonment.


June 4, 2008                                    **s/William H. Walls**
                                               United States Senior District Judge


-59-